**Bruce Dale NEAL,
Plaintiff–Respondent,**

v.

**Julia M. NEAL, Defendant–Appellant,**

and

**Bruce Douglas Eckart, Defendant.**

No. 15942.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 28, 1989.

Motion for Rehearing or Transfer
Denied Sept. 12, 1989.

Devon F. Sherwood, Sherwood, Honecker & Bender, Springfield, for defendant-appellant.

Jim Elliott, Vienna, for plaintiff-respondent.

HOGAN, Judge.

This action, which has been treated as an action for dissolution of marriage, was brought by plaintiff Bruce Dale Neal against Julia M. Neal and Bruce Douglas Eckart, Julia's son, "Individually and as Trustees of the Julia First Estate." The petition was laid in five (5) counts.

The first count is a conventional petition for dissolution of the marriage of Bruce Dale Neal and Julia M. Neal. The averments of Count II, paraphrased, are that plaintiff Bruce Dale Neal and defendant Julia M. Neal are owners of two particularly described tracts of real property located in Texas County, Missouri. It is alleged that Bruce Dale Neal and Julia M. Neal own this property by the entirety and that the property has been conveyed to a trust described as the Julia First Trust. Plaintiff Bruce Dale Neal is the settlor of the trust; defendants Julia M. Neal and Bruce Douglas Eckart are the trustees. It is further averred that the "principal place of business" of the said trust is Las Vegas, Nevada. It is further alleged that plaintiff and defendant Julia M. Neal own three motor vehicles as tenants by the entirety and defendant Julia M. Neal has assigned her interest in two of the automobiles to the Julia First Trust. Plaintiff averred, in this count, that the trust is void and invalid for failure to designate a beneficiary and consequently, all the plaintiff's right, title and interest in the trust property is being held by defendants Julia M. Neal and Bruce Eckart for the benefit of the plaintiff.

In Count III of the petition, it is verbosely alleged that defendants Julia M. Neal and Bruce Eckart have grossly mismanaged the trust and have abused and violated their fiduciary duties as trustees. For this reason, it is alleged, the trust should be terminated or the trustees should be removed and plaintiff should be appointed sole trustee of the trust.

In Count IV, plaintiff averred that defendants Julia M. Neal and Bruce Eckart violated their duties as trustees of the Julia First Trust, and as a result the trustees hold "certain marital property" in their individual names. As a result, it is alleged, a constructive trust for plaintiff's benefit has been created by operation of law. In this count, plaintiff sought an order quieting title to the two tracts of land located in Texas County, Missouri, and other relief.

In Count V, plaintiff sought a declaratory judgment determining his rights in the Julia First Trust, including an interpretation of the terms of the trust instrument. Prayer of the petition was that the trial court find the Julia First Trust to be void and invalid, or that the court impose a constructive trust on the property described in the petition for the benefit of the plaintiff, and that the court set aside deeds from the trustees of the Julia First Trust to themselves individually. Alternatively plaintiff prayed that the court remove the defendants as trustees of the trust; that the court quiet title to the "above-described" real estate or declare the rights and interests of the plaintiff in the Julia First Trust.

The record before this court shows that Julia M. Neal and Bruce Douglas Eckart were joined as defendants; both defendants were served with process and they filed a joint answer. The cause came before the trial court on June 14, 1988, and as we have noted, that court treated the action as an action for dissolution of marriage. The court disposed of the parties' real and personal property as required by § 452.330, RSMo 1986, but it did not specif-

ically dispose of Counts II, III, IV and V of the plaintiff's petition.

The "Julia First Trust" is a 14–page document. It recites, among many other things, that the trust created shall have its principal place of business at 2019 Santa Paula Drive, Las Vegas, Nevada. As we have noted, plaintiff Bruce Dale Neal is settlor of the trust and defendants Julia M. Neal and Bruce Douglas Eckart are the trustees. We find no beneficiary specifically designated as such. The trust is a multistate trust; some, perhaps most, of the trust assets were located in Nevada.

█ We have recited these facts concerning the pleadings and the trust because the plaintiff, who is respondent here, contends no final judgment has been entered. Plaintiff invokes the familiar principle that for a judgment to be final and appealable, it must dispose of all parties and all issues in the case. *Elliott v. Harris,* 423 S.W.2d 831, 832 (Mo. banc 1968); *Bays v. Lueth,* 323 S.W.2d 236, 237 (Mo.1959); *Molasky v. Brown,* 720 S.W.2d 412, 415 (Mo.App.1986). In certain circumstances a trial court may enter a judgment which adjudicates fewer than all the claims asserted or the rights and liabilities of fewer than all the parties, Rule 74.01(b), but the trial court did not undertake to enter a judgment pursuant to that rule in this case. In this case, the finality of the judgment must be determined by what was actually done according to the content, substance and effect of the decree or order actually entered. See *Starnes v. Aetna Casualty and Surety Company,* 503 S.W.2d 129, 131[2–5] (Mo. App.1973). Counts II, III, IV and V of the plaintiff's petition were laid so he might, by one means or another, obtain a declaration of his rights in the assets of the Julia First Trust. The trial court's declaration that the assets of that trust were not part of the marital estate and were the sole and separate property of defendant Julia M. Neal necessarily determined the title, right and interest of Bruce Dale Neal and Julia M. Neal in and to the trust estate. The rule applicable here is that if the judgment on the other issues in the case necessarily excludes and effectively disposes of the issue which is not specifically adjudged, then the judgment is final and appealable. *Skatoff v. Alfend,* 411 S.W.2d 169, 173 (Mo.1966); *State ex rel. Igoe v. Bradford,* 611 S.W.2d 343, 351[17] (Mo.App.1980). The only issue tendered which was not specifically decided by the trial court was the nature and extent of Bruce Douglas Eckart's interest in the corpus of the Julia First Trust. That issue, or question, was necessarily decided by a finding that the corpus of the Julia First Trust is the sole and separate property of defendant Julia M. Neal. The judgment is final and appealable.

On the merits, the only question raised is stated thus: "The trial court erred and abused its discretion in requiring Julia to pay to Bruce the sum of $7,000, representing one half of the $14,000 of marital life insurance proceeds because said ruling is based upon a misapplication of the law and is not supported by substantial evidence in that the insurance proceeds only existed in the form of either an increase in value of Julia's non-marital real property, or in the form of funds or property in Bruce's possession." The plaintiff has answered this point by saying that "[t]he trial court did not err nor abuse its discretion in requiring Julia to pay to Bruce the sum of $7,000.00, representing one half of the $14,000.00 of marital life insurance proceeds and said ruling is not based upon any misapplication of the law and is supported by substantial evidence." The background facts of the case must be recited. We shall refer to plaintiff Bruce Dale Neal as plaintiff and defendant Julia M. Neal as the defendant. The plaintiff and defendant, for convenience, shall be referred to as the parties to the action.

The plaintiff and defendant were married in Las Vegas, Nevada, on December 31, 1975, and were finally separated on July 4, 1987. When the parties were married, plaintiff was unemployed, although he had worked for some years as a carpenter in southern California and had become entitled to a pension derived from that employment in the amount of $260.50 per month, commencing in 1982. Shortly after he was married, the plaintiff began working in a

Las Vegas casino. He retired from that employment in November 1986 with a monthly retirement benefit of $347.16. At the time of his retirement as a casino worker, the plaintiff earned about $13 to $14 per hour; his gross pay was "roughly, [a] thousand dollars every couple of weeks." At the time the case was tried—June 1988— the plaintiff had no income other than his retirement, although he expected to begin receiving Social Security benefits in March 1989. At trial time plaintiff was 61 years of age.

The defendant owned a barber shop in Las Vegas, Nevada. At trial time, defendant had owned this business for about 20 years. The defendant's income from the barber shop was, she testified, $900 per month. This amount did not include "tips" and the defendant's testimony suggests her total income from the barber shop may have been considerably more than $900 per month. The defendant also received approximately $125 per month in royalties from oil wells she had inherited from her father. The defendant's income from royalties had decreased during the two years prior to trial. Defendant testified that she had accumulated $20,000 in savings at the time the parties were married and that she had saved an additional $45,000 during the marriage. Defendant was 56 years of age at trial time and according to her, had no pension or retirement plan.

While they lived in Nevada, the parties occupied a residence the defendant had purchased. Plaintiff testified that he regularly cashed his paycheck every two weeks while he was working at the casino and paid the defendant $700 in cash on each such occasion. According to the plaintiff, he had no bank account "because [defendant] always discouraged me [from] having a bank account. She said she could handle the money better than both of us having a separate bank account." The defendant was responsible for keeping track of the family finances. Defendant's evidence was that the plaintiff contributed to the family finances only very occasionally and that during the entire time the parties were married plaintiff never gave her as much as $700 at one time.

Apparently in contemplation of retirement, the parties decided to establish a campground, store and canoe rental business in Texas County. In May 1980, the plaintiff came to Missouri and with the defendant's knowledge and consent purchased an 18-acre tract of land on the Big Piney River in Texas County. The purchase price was $24,050. The record indicates that title was taken in the name of the Julia First Trust. A down payment of $3,200 was made by the defendant and the balance due was secured by a note and deed of trust in the amount of $20,850. The defendant made the down payment and she alone signed the note. The indebtedness on this piece of property was finally discharged in May 1984.

In August 1985, while he was on leave of absence from his casino job, plaintiff purchased a 5-acre tract of land in Texas County to be used as the parties' residence. Title was again taken in the name of the Julia First Trust. The purchase price was $3,500; plaintiff made a down payment of $500 from a bank account he maintained at Licking. The balance of the purchase price was paid in installments by the defendant. The balance due on this tract of land was paid by July 1987, and a trailer (built to the defendant's specifications) was purchased and installed on the property. The purchase price of the trailer was approximately $34,000; a down payment was made on the trailer and the balance due, $18,888.20, was secured by a note and a deed of trust covering both the trailer and the 5-acre tract. Plaintiff lived in the trailer and made payments on the note through March 1988, when the defendant evicted him from the premises. Plaintiff acknowledged that the balance of the note was paid by defendant Bruce Eckart.

In April 1985, the plaintiff executed a note for $10,000 to defendant Bruce Eckart. Plaintiff testified that he actually received only $6,000—the defendant deducted $4,000 which she claimed the plaintiff owed her. Plaintiff's testimony was that the proceeds of this loan were used "strictly on improving the river property, and of course, my living expenses came out

of that, also." On April 22, 1987, the defendant wired $25,000 to the plaintiff's bank for the purpose of building a store on the riverfront property and to pay part of the purchase price of the mobile home. Of this sum, approximately $14,000 to $15,000 was derived from an insurance policy which plaintiff purchased in 1980. The defendant had paid the premiums "by check." The defendant, of course, had another explanation of the intended use of the life insurance proceeds; it was her evidence that the proceeds of the policy were to be used to purchase canoes for a canoe rental business. Defendant believed the plaintiff had put the life insurance proceeds in a floor safe, which he had taken.

The defendant testified that a total of $79,000 was transferred to the plaintiff for application to the Missouri property; $25,000 on April 23, 1987, $10,000 on April 27, 1987, and additional bank transfers and loans in the amount of $44,000. The defendant's rather confused testimony indicates that approximately $66,000 was spent in purchasing the real property and the trailer. The defendant testified that none of the money spent on the Missouri property was the plaintiff's money. The plaintiff was unable to say how much of "[his] money, funds that [he had] earned" went into the Missouri property.

While he was in Missouri, plaintiff had a 20 × 33 foot building built on the riverfront property for the purpose of housing a store and part of the canoe rental business the parties had in mind. He testified to expenditures during 1987 amounting to some $42,360, consisting of $7,200 for labor in improving the riverfront property; $28,596 for " 'material for the store and a down payment on the house' "; $2,382 for doctors, medicine, utilities and miscellaneous expenses. Plaintiff testified to other and further expenses in the amount of $3,767.

The defendant gave as her opinion that the value of the two parcels of realty in Texas County, after they were improved, was $70,000 to $71,000. The plaintiff's valuation was $69,750. Other specific items of property listed for division were $4,000 remaining in Julia's trust account, a tiller

purchased for $1,800 in Nevada by the defendant and shipped to Missouri; two trucks, one of which defendant had purchased and put in the parties' joint names, the other a truck which plaintiff bought and titled in the name of the trust. It is inferable that the defendant paid for both trucks.

Basing its judgment on the evidence we have recited, the trial court found the Missouri real property and the parties Nevada residence to be the defendant's sole and separate property. Defendant was also awarded the remaining corpus of the Julia First Trust. Some of the household goods and the carpenter's pension were found to be the plaintiff's separate property. The trial court found the following property to be marital property: 1) two Chevrolet trucks; 2) an insurance policy in plaintiff's name, "cashed in" for the sum of $14,000; 3) an interest in the Operating Engineers Pension Trust earned by the plaintiff (plaintiff's casino pension) and 4) an increase in the value of the Texas County realty in the amount of $7,500. The particular award to which objection is made is stated thus in the trial court's decree:

"(c) Plaintiff is to receive $7,000.00, representing half of the life insurance proceeds, which is to be paid to plaintiff by defendant, and plaintiff is further given a lien on the [Texas County property] to the extent of the $7,000.00 owed by the defendant. Upon payment of $7,000.00 to plaintiff by defendant, plaintiff is to execute a deed of any [sic] of his right, title and interest in and to said real estate to the defendant...."

■ We have already stated, but shall reiterate, the defendant's single assignment of error. The defendant asserts that the trial court erred in requiring her to pay plaintiff the sum of $7,000, representing one-half of the marital life insurance proceeds "because that ruling is based upon a misapplication of the law and is not supported by substantial evidence in that the insurance proceeds only existed in the form of either an increase in value of [defendant's] non-marital real property, or in the form of funds or property in [plaintiff's]

possession." The plaintiff in substance argues that the trial court was merely trying to "reach a just result" and the judgment should be affirmed.

The merits of the defendant's assignment of error must be determined by a consideration of the "source of funds" rule adopted by our Supreme Court in *Hoffmann v. Hoffmann*, 676 S.W.2d 817 (Mo. banc 1984). Therein, the court held that:

> "Under the source of funds rule, the character of the property is determined by the source of funds financing the purchase. *The property is considered to be acquired as it is paid for so that a portion of the property's ultimate value will be marital property.*" (Our emphasis.)

*Hoffmann*, 676 S.W.2d at 824. Although we were concerned with the enhancement of the value of a spouse's separate property by the expenditure of marital funds or the uncompensated contribution of effort, skill or funds of the other spouse, this court, in *In re Marriage of Herr*, 705 S.W.2d 619, 623–24 (Mo.App.1986), recognized that:

> " '... Under the source of funds rule, when property is acquired by an expenditure of both nonmarital and marital property, *the property [so acquired] is characterized as part nonmarital and part marital.* Thus, a spouse contributing nonmarital property is entitled to an interest in the property in the ratio of the nonmarital investment to the total nonmarital and marital investment in the property. *The remaining property is characterized as marital property and its value is subject to equitable distribution. Thus, the spouse who contributed nonmarital funds, and the marital unit that contributed marital funds each receive a proportionate and fair return on their investment.'* *Harper v. Harper*, supra, 448 A.2d at 929. See also *McLeod v. McLeod*, supra [74 N.C. App. 144, 327 S.E.2d 910 (1985) ]." (Emphasis added.)

Therefore, under the source of funds rule, property acquired during marriage, including real property, may have a dual character if it is acquired by the expenditure of both marital and nonmarital funds. In this case, no findings of fact on controverted issues were requested, see *Dardick v. Dardick*, 670 S.W.2d 865, 867, 51 A.L.R.4th 1 (Mo. banc 1984), and we must assume that all fact issues were found in accordance with the result reached. Rule 73.01(a)(2); *Irwin v. Irwin*, 678 S.W.2d 861, 862[2] (Mo.App.1984). As we have recited, the defendant wired the plaintiff $25,000 in April 1987. This sum included $14,000 to $15,000 which represented the cash value of a life insurance policy. The policy was purchased by the plaintiff; defendant wrote the checks to pay the premiums. The defendant testified that the funds used to pay the policy premiums were earnings from her barber shop but in light of the plaintiff's evidence that he regularly contributed his earnings to the parties' bank account—or bank accounts—the trial court might well have concluded the policy was purchased with funds deposited in a joint bank account. Statements by a spouse as to the character of particular property are mere legal conclusions, in no way binding on the trial court. See *Heilman v. Heilman*, 700 S.W.2d 843, 844 (Mo. banc 1985). The rule is that a bank account in which both separate and marital funds are commingled is marital property, even if the account is maintained in the name of one spouse only. *Sturgis v. Sturgis*, 663 S.W.2d 375, 380[4, 5] (Mo.App. 1983). Further, the cash value of a life insurance policy purchased with funds from a joint bank account may be marital property. *Walker v. Walker*, 631 S.W.2d 68, 71[6, 7] (Mo.App.1982).

So, if, as the trial court might have found, the life insurance policy was purchased with funds from a joint bank account, the cash value of the policy was marital property, and if the proceeds of the life insurance policy went toward the purchase or improvement of the Missouri property, that property would be partly marital and partly nonmarital and the marital interest would be subject to equitable apportionment. The value of the marital interest can be determined by applying a variant of

the formula discussed by this court in *Herr*, 705 S.W.2d at 625. In this case the property was free of encumbrance at trial time, so one might use the formula suggested in *Grant v. Zich*, 300 Md. 256, 477 A.2d 1163, 1173–74, n. 9 (1984).[1] The proper formula for use in this case is mc/tc × v. Marital contribution (mc) is the marital contribution toward the purchase or improvement of the Missouri property; the total contribution (tc) is the sum of both marital and nonmarital contributions. Value (v) is the total value of the property at the time of its distribution.

The defendant concedes that the value of the Missouri property at the time it was distributed was approximately $70,000. This figure included an appreciation in value in the amount of $7,500, which the trial court found to be marital property. The surrender value of the life insurance policy was $14,000. Applying the formula we have discussed, we discover that $14,000 divided by $70,000 is .2 and that figure multiplied by the total value is, as we would expect, $14,000. If the value of the marital contribution was $14,000 it was not improper to divide that contribution in half and to order the defendant to reimburse the plaintiff for his share of the marital contribution; the court was further entitled to impose a lien to secure payment of that marital contribution. *Hoffmann v. Hoffmann*, 676 S.W.2d at 824; *Rickelman v. Rickelman*, 625 S.W.2d 901, 902 (Mo.App. 1981); *Ravenscroft v. Ravenscroft*, 585 S.W.2d 270, 272 (Mo.App.1979).

■ The only real question presented by this appeal is whether the proceeds of the life insurance policy can be traced into the Missouri property. The courts which have stated and developed the source of funds doctrine have realized that if property is to be adjudged partly marital and partly nonmarital, the party asserting a contribution of marital funds or effort must prove his contribution by tracing the marital contribution into its product. In *Sumners v. Sumners*, 701 S.W.2d 720, 722 (Mo. banc

1985), the court reversed the judgment because there was no evidence of the extent to which marital funds were used to purchase partnership assets which were later transferred to a corporation which was part marital and part nonmarital. In *Herr*, 705 S.W.2d at 621, this court observed that a dearth of evidence relative to the source of funds rule might require reversal and remand. In both *Tibbetts v. Tibbetts*, 406 A.2d 70, 75 (Me.1979), and *Harper v. Harper*, 294 Md. 54, 448 A.2d 916, 925 (1982), the court recognized that when an item of property is found to be partly marital and partly nonmarital, the court must trace the marital (or nonmarital) contributions made to the acquisition or improvement of the particular item. Here, plaintiff asserted the Missouri property was marital property, and the ultimate and determinative question is whether he proved that the $14,000 went into the purchase or improvement of the property.

Our review of the case is limited to determining whether there is no substantial evidence to support the award, or the award is against the weight of the evidence, or the trial court has erroneously declared or applied the law. Rule 73.01(c); *Murphy v. Carron*, 536 S.W.2d 30, 32[1–3] (Mo. banc 1976). We cannot confidently say, in this case, that there is no substantial evidence to support the finding complained of, nor does a review of the record presented generate any firm belief that the finding is wrong. We do not have the exhibits before us; they have been summarized, but we do not have them to examine. It is true that at one point during his testimony, the plaintiff stated that as part of an advance made by the defendant in April 1987, he received the proceeds of the life insurance policy to "pay part of the purchase price of the mobile home." Plaintiff did not, at this point, testify directly to the recipient of the payment or payments he made. The plaintiff did, however, produce several sets of cancelled checks representing expenditures made during the year 1987. One envelope contained checks given for labor on the

---

1. Several variations of the source of funds formula discussed in *Herr* have been developed. See L. Golden, Equitable Distribution of Property § 5.07 (1983 and Supp.1988, pp. 44–47). We do not suggest that one particular formula is necessarily applicable in all situations.

store on the riverfront property; another envelope, the record indicates, contained checks in the amount of $28,596.48 which were given in payment for material and a "down payment" on the mobile home. A trial court, functioning as a fact-finder, can draw all reasonable inferences from the evidence presented to it and can base its ultimate conclusions upon such reasonable inferences. *State ex rel. Eagleton v. Patrick,* 370 S.W.2d 254, 257[5], 97 A.L.R.2d 1180, 1184 (Mo.1963); *Novak v. Akers,* 669 S.W.2d 644, 647 (Mo.App.1984); *Wills v. Alcorn,* 636 S.W.2d 142, 145 (Mo.App.1982). In the absence of a schedule of payments and without the exhibits before us, we cannot say that the inferences drawn by the trial court were unreasonable. Accordingly, the judgment is affirmed.

MAUS, J., concurs.

FLANIGAN, P.J., dissents in separate opinion.

FLANIGAN, Presiding Judge, dissenting.

I respectfully dissent.

This action involves multiple claims and multiple parties. The petition is in five counts. Count I requests dissolution of the marriage. Counts II, III, IV, and V are all directed against the two defendants individually and as trustees. It is unnecessary to discuss a possible misjoinder of parties because, as Rule 52.06 states, "Misjoinder of parties is not ground for dismissal of an action." It is also unnecessary to determine whether the petition was subject to the defense "that several claims have been improperly united," Rule 55.27(a)(11), because such a defense, whether or not available here, was waived because it was not raised by motion or in the answer. Rule 55.27(g)(1).

The petition, with respect to Counts II, III, IV, and V, requested that the court find the Julia First Trust to be void, declare a resulting trust in favor of plaintiff, establish a constructive trust for the benefit of the plaintiff, set aside deeds from the trustees to themselves individually, terminate the trust or remove the trustees and appoint plaintiff as the trustee of the trust

corpus, quiet the title to certain real estate, enter a declaratory judgment as to the rights of the plaintiff "with regard to the Julia First Trust," and for other relief. A review of the lengthy petition does not show that the various claims for relief were unsupported by appropriate allegations constituting a claim.

The so-called "decree of dissolution," on which the instant appeal is based, makes no mention of Counts II, III, IV, and V, nor does it mention defendant Bruce Douglas Eckart, either in his individual capacity or as trustee.

The "decree of dissolution" did not contain "an express determination that there is no just reason for delay. In the absence of such determination, any order or other form of decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to *any* of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating *all* the claims and the rights and liabilities of *all* the parties." Rule 74.01(b). (Emphasis added.)

My comparison of the decree with the pleadings leads me to the conclusion that the trial court adjudicated "fewer than all the claims or the rights and liabilities of fewer than all the parties." I would dismiss the appeal for lack of a final judgment.